## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RYAN PERRI Derivatively on Behalf of DANIMER SCIENTIFIC, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| STEPHEN E. CROSKREY, JOHN A. DOWDY, III, CHRISTY BASCO, PHILIP GREGORY CALHOUN, GREGORY HUNT, ISAO NODA, STUART W. PRATT, JOHN P. AMBOIAN and RICHARD J. HENDRIX, | ) ) Case No. ) ) ) |
| Individual Defendants, | ) ) |
| -and- | ) ) |
| DANIMER SCIENTIFIC, INC., a Delaware corporation, | ) ) ) |
| Nominal Defendant. | ) ) |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Ryan Perri ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following upon information and belief, except as to the allegations specifically pertaining to Plaintiff which are based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Nominal Defendant Danimer Scientific, Inc. ("Danimer" or the "Company") against members of its board of directors (the "Board") and members of upper management. The wrongdoing alleged herein has caused substantial damage to Danimer's reputation, goodwill, and standing in the business community and has exposed Danimer to substantial potential liability for violations of federal securities laws and the costs associated with defending itself. The violations of the law outlined herein have damaged Danimer in the form of, among other things, millions of dollars in losses to the Company's market capitalization.

2.      This action seeks to remedy wrongdoing committed by Danimer's directors and officers from October 5, 2020 through the present (the "Relevant Period").

3.      Danimer produces polyhydroxyalkanoates ("PHAs"), a purportedly biodegradable plastic alternative used in a range of plastic applications, including water bottles, straws, food containers, and other items under the Nodax brand name ("Nodax"), polylactic acid ("PLA") based resins for coating disposable paper cups, and other biopolymers. The company offers its products to manufacturers in the plastics industry.

4.      Danimer was incorporated in 2004 and is headquartered in Bainbridge, Georgia. Danimer was previously known as Live Oak Acquisition Corp. ("Live Oak").

5.      On December 29, 2020, Live Oak entered into a business combination (the "Amalgamation") with Meredian Holdings Group, Inc., doing business as Danimer Scientific ("Danimer's Predecessor").

6.      Following the Amalgamation, Live Oak changed its name to Danimer Scientific, Inc., replaced management with Danimer's Predecessor personnel and continued to operate the same business as had Danimer's Predecessor.

7.     During the Relevant Period, the Company made false or misleading statements that failed to disclose that (i) Danimer had deficient internal controls; (ii) as a result, the Company had misrepresented, inter alia, its operation's size and regulatory compliance; (iii) the Company had overstated Nodax's biodegradability, particularly in oceans and landfills and failed to properly disclose environmental compliance issues; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

8.     The Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact. The Individual Defendants also willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

9.     As detailed herein, and as alleged in the ongoing federal securities class action in the Eastern District of New York styled *Rosencrants v. Danimer Scientific, Inc. et al.,* Case No. 1:21cv2708, (the "Federal Securities Class Action"), Danimer's officers and directors substantially damaged the Company by filing false and misleading statements that omitted material adverse facts.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1) and raise a federal question pertaining to the claims made in the Federal Securities Class Action based on violations of the Exchange Act. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

11.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have such jurisdiction.

3

12.     Venue is proper in this District because Danimer is incorporated in this District, and the Defendants' activities have had an effect in this District.

## THE PARTIES

**Plaintiff**

13.     Plaintiff Ryan Perri is and has continuously been a stockholder of Danimer during the wrongdoing complained of herein.

**Nominal Defendant**

14.     Defendant Danimer is a Delaware corporation with its principal executive offices at 140 Industrial Boulevard, Bainbridge, Georgia 39817. Danimer's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "DNMR."

**Individual Defendants**

15.     Defendant Stephen E. Croskrey ("Croskrey") is Danimer's Chief Executive Officer and a director and Chairman of the Board since December 2020.

16.     Defendant John A. Dowdy, III ("Dowdy") has served as the Company's CFO since December 2020.

17.     Defendant Christy Basco ("Basco") has served as a director of Danimer since December 2020 and prior to such time, was a member of Danimer's Predecessor's board of directors from July 2020 to December 2020. Defendant Basco is a member of the company's Audit Committee.

18.     Defendant Philip Gregory Calhoun ("Calhoun") has served as a director of Danimer since December 2020, and prior to such time was a member of Danimer's Predecessor's board of directors from 2014 to December 2020. Defendant Calhoun also served as a director on two of Danimer's Predecessor's subsidiary companies.

19.     Defendant Gregory Hunt ("Hunt") has served as a director of Danimer since

December 2020, and prior to such time, was a director of Danimer's Predecessor's board of directors from June 2019 to December 2020.

20.     Defendant Isao Noda ("Noda") has served as a director of Danimer since December 2020, and prior to that, a member of Danimer's Predecessor's board of directors from 2016 to December 2020. Noda is a member of Danimer's Nominating and Corporate Governance Committee.

21.     Defendant Stuart W. Pratt ("Pratt") has served as a director of Danimer since December 2020, and prior to such time, was a member of Danimer's Predecessor's board of directors from May 2015 to December 2020. Pratt also served as Danimer's Predecessor's chairman of the board from January 2016 to December 2020. As acknowledged in Form 10-K/A filed on May 14, 2021, Pratt is not considered an independent director. Pratt is a member of Danimer's Nominating and Corporate Governance Committee.

22.     Defendant John P. Amboian ("Amboian") has served as a director of Danimer since December 2020, and previously served as Live Oak's chairman from May 2020 to December 2020. He is a member of the Company's Audit Committee. Amboian is also a member of Danimer's Nominating and Corporate Governance Committee.

23.     Defendant Richard Hendrix ("Hendrix") has served as a director of Danimer since December 2020, and previously served as Live Oak's Chief Executive Officer and director from May 2020 to December 2020.

24.     Collectively, Defendants Croskrey, Dowdy, Basco, Calhoun, Hunt, Noda, Pratt, Amboian and Hendrix, are referred to herein as the "Individual Defendants."

25.     The Individual Defendants, because of their positions with Danimer, possessed the power and authority to control the contents of Danimer's reports to the SEC, press releases, and

presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance, and each had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and/or misleading.

## SUBSTANTIVE ALLEGATIONS

### Background

26.     During the Relevant Period, the Individual Defendants made materially false or misleading statements regarding the environmental friendliness of Danimer's operations, the biodegradability of Nodax and its superiority to PLA-based products, the Company's regulatory risks, the size of Danimer's operations, and Danimer's internal controls, which had the effect of artificially inflating the Company's stock. The Individual Defendants were motivated to keep the Company's stock inflated because they had invested heavily in the Company as a result of the Amalgamation in December 2020. The Company had been struggling financially and the stock price would benefit from the injection of more positive news. The Company's financial problems were acknowledged when, in its Form 10-K filed on March 30, 2021 for the fiscal year ended December 31, 2020 (the "2020 10-K"), the Company stated it had an accumulated deficit of over $62 million and that it was not "certain that [it] will generate sufficient revenue to operate our business and become profitable."

27.     Pursuant to the Amalgamation, certain Directors received private warrants connected with the initial public offering of Live Oak. Further, certain Directors purchased shares

of common stock in private offerings following the conversion of the shares known as founder shares. Pursuant to an agreement with these shareholders, Danimer agreed to register these warrants and common stock for resale, eventually filing the February Prospectus (defined below). Pursuant to the February Prospectus, certain of Apollo Management, LP ("Apollo") subsidiaries registered 2.5 million shares for sale, representing all of the shares held by those entities. Apollo is the sole member and/or manager of Apollo A-N Credit Fund (Delaware), L.P.; Apollo Atlas Master Fund, LLC; Apollo Credit Strategies Master Fund Ltd.; and Apollo PPF Credit Strategies, LLC. Further, Live Oak Sponsor Partners, LLC ("Live Oak Sponsor Partners"), of which Hendrix is one of the three managing members, and in which Amboian also holds a direct or indirect interest, registered to sell 5 million shares of common stock and 3 million warrants, which represented all of its holdings. Another entity associated with Hendrix, Live Oak Valfund Plastics Fund LLC, registered all of its 4,905,000 shares to sell. These pre-planned sales are indicative of motivation to ensure that the stock price of Danimer is kept at an artificially inflated level until those sales were executed.

28.     Further, on May 14, 2021 Danimer announced that it would redeem all of its outstanding warrants ("Public Warrants") to purchase shares of its common stock that were issued under a Warrant Agreement dated May 5, 2020 ("Warrant Agreement"). The Warrant Agreement prescribed that Danimer can redeem all of the Public Warrants if the last sales price of the common stock was at least $18 per share on twenty trading days within any thirty-day trading period ending on the third trading day prior to the date on which a notice of redemption is given. Holders could exercise their rights to purchase common stock at the exercise price of $11.50 per share.

29.     So as to achieve maximum proceeds for the sale of stock and obtain additional cash from the redemption of the Public Warrants, the Company made a series of false statements to

convince shareholders and the market that Nodax would provide explosive growth for the Company. The key to Nodax's success was the investing public's confidence in its superior biodegradability, as compared to other plastics available in the market. At an investor presentation in connection with the proposed Amalgamation with Live Oak (the "Amalgamation Presentation"), Danimer's Predecessor claimed that its PHAs (Nodax) were fully degradable in 12-18 weeks after the product was discarded. Because of this, the Amalgamation Presentation estimated that revenue would increase from $51 million in 2020, to $513 million by 2025. Likewise, net income was estimated to increase from $2 million in 2020, to $169 million by 2025. These statements were made prematurely, rather than in accordance with the reality of the Company's financial situation or realistic forecasts.

30.     A portion of these anticipated revenues were alleged to flow from capital expenditures that would grow the Company's Kentucky PHA facility and its anticipated "greenfield" facility to be built in Bainbridge, Georgia.

**Materially False and Misleading Statements**

31.     Leading up to the Amalgamation, Danimer's Predecessor's management had already begun touting Nodax as an innovative product with the potential to replace traditional fossil-fuel plastics and eliminate plastic-associated litter through its quick biodegradability attributes. For example, on October 5, 2020, the Amalgamation Presentation alleged that its PHAs, marketed under the brand name Nodax, were "[f]ully degradable in 12-18 weeks after the product is discarded."

32.     The Amalgamation Presentation also boasted that Danimer's Predecessor's "Rapidly Growing Blue Chip Customer Base with Take-or-Pay Contracts has Led to [a] Fully Sold-Out Position[,]" with management forecasting PHA finished products volume of 2 million

pounds and $6 million in sales for 2020, implying a PHA average selling price ("ASP") of $3.00 per pound.

33.     On December 29, 2020, Danimer filed an after-market press release on Form 8-K announcing the closing of the Amalgamation. That press release stated that "[t]he Company's signature polymer, Nodax™ PHA [], is a **100% biodegradable, renewable, and sustainable plastic**" that "**is the first PHA polymer to be certified as marine degradable, the highest standard of biodegradability, which verifies the material will fully degrade in ocean water without leaving behind harmful microplastics.**" (Emphasis added). The press release also stated that the Company was working with blue chip companies to "introduce more sustainable alternatives to straws, food and beverage containers, and flexible packaging, among others[,]" and that, "[b]ased on signed and pending contracts, the Company is **fully sold out of all production in its Kentucky facility[**.]" (Emphasis Added).

34.     On January 28, 2021, Danimer filed a registration statement on Form S-1 with the SEC, which, after amendment, was declared effective by the SEC on February 16, 2021, and which was signed by the Individual Defendants (the "Registration Statement"). The Registration Statement qualified Danimer as delivering "renewable, environmentally friendly bioplastic materials to global consumer product companies."

35.     In relation to the Company's PHA products' biodegradability, particularly Nodax, the Registration Statement stated:

> PHA is a naturally occurring bioplastic that effectively biodegrades in both anaerobic environments, such as a waste treatment facility, and aerobic environments, such as an ocean. **PHA will degrade in environments in which microbes or fungi are present, without the presence of heat and moisture…PHA is degradable in industrial compost, home compost, soil, fresh water, marine water and anaerobic conditions…Danimer's Nodax® PHA possesses seven TUV AUSTRIA [("TUV")] certifications and statements of industrial and home compostability, is biodegradable in anaerobic soil, freshwater and marine environments and is 100% bio-based.**

(Emphasis Added).

36.     Additionally, the Registration Statement noted, "[u]nlike PLA [polylactic acid]…**Danimer biopolymers can: biodegrade in natural soil and water environments, including the marine environment[.]**" (Emphasis Added).

37.     The Registration Statement also utilized boilerplate warnings including: "climate change concerns, and changes in the regulation of such concerns, including greenhouse gas emissions, could also subject us to additional costs and restrictions"; that Danimer's operations "are subject to an extensive regulatory approval process by the FDA and other regulatory agencies in the U.S. and abroad"; and that "a marketed product is subject to continual review, and later discovery of previously unknown safety issues or failure to comply with the applicable regulatory requirements may result in restrictions . . . as well as possible civil or criminal sanctions." Further, that "increased regulation of, or prohibition on, the use of plastics generally . . . could . . . limit the use of these products, and could lead to . . . an increase in the cost of production of such products." Each of these warnings failed to disclose that Danimer's operations were specifically regulated by environmental agencies, much less that Danimer had been cited for noncompliance with environmental regulations in the past.

38.     As to the size of Danimer's operations, the Registration Statement stated that "Danimer's corporate headquarters, primary research facility, PLA reactive extrusion plant, tolling operation, as well the site of its PHA commercial demonstration plant are located in Bainbridge, GA, in approximately 200,000 square feet of real property."

39.     The Registration Statement further represented, with respect to internal controls, that Individual Defendants relied on information technology systems to aid with "overall internal control processes, maintain records of our property, plant and equipment"; that Danimer will

10

"adopt new internal controls and disclosure controls and procedures"; and that Defendant Basco, "has extensive experience in financial reporting and oversight in maintaining strong internal controls."

40.     On February 9, 2021, Danimer issued a press release stating it had hired an innovative packaging expert as the Company's Vice President – Technology Development R&D. The press release boasted that "**Nodax™ PHA possesses six TUV AUSTRIA certifications of industrial and home compostability, is biodegradable in soil, fresh water and marine environments and is 100% bio-based.**" (Emphasis Added).

41.     On February 16, 2021, Danimer filed a prospectus on Form 424B3 with the SEC ("the February Prospectus"), which formed part of the Registration Statement, and contained the same statements as referenced in ¶¶ 34-39 above, regarding the environmental friendliness of Danimer's operations, the biodegradability of Nodax and its superiority to PLA-based products, the Company's regulatory risks, the size of Danimer's operations, and Danimer's internal controls.

42.     On March 16, 2021, as well as other times during the Relevant Period, Danimer's website stated that the Company's Bainbridge, Georgia headquarters was comprised of a "20-acre campus with over 235,000 sqft of manufacturing space," and continues to occupy this space as of the filing of this Complaint.[1]

43.     The statements referenced above were materially false and misleading because Individual Defendants made false and/or misleading statements and failed to disclose that: (i) Danimer had deficient internal controls; (ii) as a result, the Company had misrepresented, inter alia, its operations' size and regulatory compliance; (iii) Individual Defendants had overstated Nodax's biodegradability, particularly in oceans and landfills; and (iv) as a result, the Company's

---

[1] See: https://web.archive.org/web/20210316161919/https://danimerscientific.com/

public statements were materially false and misleading at all relevant times.

**<u>The Truth Begins to be Revealed Regarding the Biodegradability of Nodax</u>**

44.     On March 20, 2021, a Saturday, WSJ published an article entitled "Plastic Straws That Quickly Biodegrade in the Ocean, Not Quite, Scientists Say" (the "WSJ Article") responding to Danimer's claims that Nodax breaks down far more quickly than fossil-fuel plastics. The WSJ Article reported that "many claims about Nodax are exaggerated and misleading, according to several experts on biodegradable plastics," and that, despite breaking down more quickly than traditional fossil-fuel plastics, "[b]iodegradable straws, bottles and bags can persist in the ocean for several years."

45.     The WSJ Article referred to the statements of experts, including a Michigan State University professor with over 30 years' experience researching biodegradable plastics, who stated that "variations in temperature and microorganisms in the ocean make it very difficult to promise a bottle made from Nodax will biodegrade in 18 months[.]" According to this same expert, even though Danimer touts that Nodax was certified by TUV , which is an international certification body for compostable items, "[t]he marine biodegradability test used to gain certification from TUV is conducted in a lab using seawater at a temperature of 30 degrees Celsius (86 Fahrenheit)[,]" whereas "the average ocean temperature is 4 degrees Celsius (39.2 Fahrenheit), which means items could degrade more slowly in real life[.]" The same expert noted that "[a]t some ocean temperatures, Nodax straws could take between five and 10 years to biodegrade," whereas "[b]ags and bottles could take even longer."

46.     Additionally, the WSJ Article cited TUV's own bioplastics certification department head, who cautioned that "[l]ab tests are done on sheets of plastic, while finished products come in different shapes and thicknesses or have dyes and labels, all of which could impact how they biodegrade in the real world[.]"

47.    Notably, the WSJ queried Danimer's Chief Science and Technology Officer, Phil Van Trump ("Van Trump"), on Defendant Croskrey's statements during an investor call on October 5, 2020 that Nodax would be consumed by bacteria if it ended up in a landfill. This was important because, according to the WSJ, "[g]iven the lack of widespread composting facilities that accept packaging waste, many products made from Nodax today are bound to end up in landfills." Responding to the WSJ, Van Trump stated that "**the claim by the Danimer chief[, Defendant Croskrey,] wasn't wholly accurate, saying Nodax products are unlikely to biodegrade in most modern landfills.**" Emphasis Added.

48.    On March 22, 2021, the first trading day following publication of the WSJ Article, Danimer's stock price fell to $43.55 per share, or decreased 12.87% from the previous trading day's closing price.

49.    On March 30, 2021 Danimer filed the 2020 10-K with the SEC which was signed by all of the Individual Defendants.

50.    The 2020 10-K stated that:

*PHA-Based Resins*

We are a leading producer of polyhydroxyalkanoate ("PHA"), **a new, 100% biodegradable plastic feedstock alternative sold under the proprietary Nodax® brand name, for usage in a wide variety of plastic applications including water bottles, straws, food containers, among other things**…Utilizing PHA as a base resin significantly expands the number of potential applications for bioplastics in the industry and enables us to produce resin that is not just compostable, but also **fully biodegradable**.

***

*Factors Impacting Our Revenue*

We derive our revenue from product sales of PLA- and PHA-based resins as well as from services such as R&D and tolling.

Our product revenue is significantly impacted by our ability to successfully scale the Kentucky Facility for commercial production of PHA. The completion of

13

Phase I and Phase II of the Kentucky Facility will significantly increase our capacity to produce and sell PHA, which is in high demand by our customers. Using our PHAs as base resin significantly expands the number of potential applications for bioplastics and also enables us to produce **a resin that is not just compostable, but also fully biodegradable**.

\*\*\*

We derive our revenues from: 1) product sales of developed compostable resins based on polyactic acid ("PLA"), polyhydroxyalkanoates ("PHA"), and other renewable materials; and 2) research and development (R&D) services related to developing customized **formulations of biodegradable resins** based on PHA as well as tolling revenues.

(Emphasis Added).

51.     The statements referenced above were materially false and misleading because Individual Defendants made false and/or misleading statements and failed to disclose that: (i) Danimer had deficient internal controls; (ii) as a result, the Company had misrepresented, inter alia, its regulatory compliance; (iii) Individual Defendants had overstated Nodax's biodegradability, particularly in oceans and landfills; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth continues to be Revealed Regarding the Biodegradability of Nodax and Begins to be Revealed Regarding the Company's Emissions of Hazardous Air Pollutants, Regulatory Risks, the Size of Danimer's Operations, and Danimer's Lack of Internal Controls**

52.     On April 22, 2021, Spruce Point published a report on Danimer, noting various inconsistencies with Danimer's Predecessor's, and Danimer's historical and present claims regarding its business and operations (the "Spruce Report"). For example, the Spruce Report stated that, on the Company's current website, Danimer describes its Bainbridge, Georgia facility as a "*20-acre campus with over 235,000 sqft of manufacturing space*," but that the Company's SEC filings attest to its Bainbridge location comprising only "*200,000 square feet **of real property***." The Spruce Report also highlighted that these claims differed from Danimer's Predecessor's prior

14

claims about its manufacturing space, including that, in 2017, Danimer's Predecessor said it had acquired "1.2 million square feet" of additional manufacturing space nested in a "135-acre campus." Additionally, the Spruce Report pointed out that Danimer had recently dropped certain representations it had made in the Amalgamation Presentation related to Nodax's makeup and degradability, as well as the Company's expected profitability. For example, the Amalgamation Presentation claimed that Danimer's PHAs were "[f]ully degradable in 12-18 weeks after the product is discarded." Danimer later removed those claims in its fourth quarter and full year 2020 investor presentation filed on March 29, 2021 (the "4Q/FY20 Presentation") for its March 29, 2021 earnings call (the "4Q/FY20 Earnings Call"), shortly after WSJ published its article on Danimer.

53.     Supporting the WSJ Article's assertions, the Spruce Report cited to a scientific article published in 2020, entitled "Biodegradation of Wasted Bioplastics in Natural and Industrial Environments: A Review," which similarly noted that Danimer's claims regarding Nodax's biodegradability were overstated. That article found, *inter alia*, that "PLA-based bioplastics showed a similar biodegradability of PHAs," and that PHA-based bioplastics, such as Nodax, had "less than 10% of biodegradability over a period of one year in aquatic environments[,]" while "[b]iodegradation was in general below 50% after one year in soil environment[.]" The Spruce Report stated that the same scientific article also found that PHA-based bioplastics did not completely degrade in anaerobic environments, such as sealed landfills, and that such disposal was harmful to the environment as PHA-based bioplastics in these environments released methane, a greenhouse gas worse than carbon-dioxide.

54.     Following publication of the Spruce Report, Danimer's stock price fell to $22.99 per share on April 22, 2021, an 8.04% decrease from the previous trading day's closing price of $25. Although this report was devastating, the stock price was still artificially inflated.

55.     On May 4, 2021, Spruce Point published another damning report on Danimer, alleging that the Company had "wildly overstated" production figures, pricing, and financial projections based on documents acquired from the Kentucky Department of Environmental Protection ("KDEP") via a The Freedom of Information Act ("FOIA") request. (the "Second Spruce Report"). For example, the Second Spruce Report cited a January 29, 2020 letter from Hall Environmental Consultants, LLC, submitted as part of a permit required semi-annual report on behalf of Danimer Scientific Kentucky, Inc. ("Danimer Kentucky"), to the KDEP Division for Air Quality. The contents of the letter showed that Danimer's internal controls related to its production figures were deficient:

> *It should be noted that natural gas usage and bioplastic production numbers are slightly different from what was submitted for the 2020 first-half semiannual report.* Danimer was in the process of changing their natural gas supplier and there was some confusion on the reported usages. *In addition, the bioplastic production numbers that were previously submitted included production from the companies [sic] Georgia location.* The facility was not able to operate in January/February of 2020 as the facility had yet to construct. *The updated information provided in this report accurately reflects what actually occurred at this facility in 2020.*

(Emphases added).

56.     The Second Spruce Report also cited the Danimer facility biopolymer production data that Spruce Point had received through its FOIA request, which did "not properly reconcile," further casting doubt on the accuracy of the Company's internal controls. In particular, Spruce Point deducted Kentucky-only monthly production records from aggregated Kentucky and Georgia monthly production records to calculate the implied Georgia-only monthly production records. Spruce Point noted: "Based on the data, for April and June 2020, implied Georgia facility production was negative, a mathematically impossible result." Spruce Point concluded that, "[d]espite this clear evidence showing the Company cannot accurately report production figures, Danimer does not disclose any weaknesses of its internal financial controls."

57.     Further, the Second Spruce Report noted "inconsistent figures in Danimer's reporting of monthly natural gas usage for its Kentucky facility." Specifically, Spruce Point found that in a first-half of 2020 report to the KDEP Division for Air Quality, Danimer recorded the Kentucky facility's natural gas usage figures from March 1, 2020 to June 1, 2020 that differed from what it later recorded for those same months when reporting its full year 2020 monthly natural gas usage. Spruce Point reported "that upon notification by an independent consultant that the numbers were inaccurate, Van Trump" had materially restated the figures **"on January 29, 2021 after Danimer completed its SPAC transaction on December 29, 2020[,]"** but **"made no SEC disclosure about the production errors, or mention of any financial control issues in its 10-K."**

58.     Further, the Second Spruce Report found that Danimer's PHA ASP appeared 30%-42% below the Company's claims. For example, in FOIA-requested documents, the Second Spruce Report found for the full year 2020 that the Kentucky facility's actual production was 2,527,953 pounds, which, when compared with Danimer's reported sales of $4.4 million in its 2020 annual report, implied a PHA ASP of $1.74 per pound (i.e., $4.4 million in sales divided by 2.527 million pounds in production). Meanwhile, in slide 16 of the Amalgamation Presentation (slide 26 of which stated that the Company was in a "Fully Sold-Out" position), management forecast 2 million pounds of production and $6 million in sales, which implied a PHA ASP of $3.00 per pound. Additionally, on the 4Q/FY20 Earnings Call, Defendant Croskrey said "**the average selling price is pushing about 270 [$2.70] right now**" and has "been increasing slightly, over the last few months." These numbers were significantly higher than the $1.74 per pound PHA ASP supported by FOIA documents and the 2020 10-K. Spruce Point also noted that, "[e]ven if we assume a one-month lag between production and shipment, ASP would still be $2.01/lb. or

20% - 33% below management's claims[.]" Spruce Point also questioned, after comparing the Company's six and nine month reported results to determine the Company's third quarter results, why product sales declined by 13.8% and total sales fell by 6.3% in the fourth quarter of 2020 if the Company's claim that it was in a "Fully Sold-Out" position was accurate.

59.    The Second Spruce Report also pointed out that Danimer had failed to disclose that it is regulated by environmental agencies, that its production facilities emit hazardous air pollutants, and that the Company had been subject to prior regulatory violations. Specifically, the Second Spruce Report cited a KDEP Division for Air Quality Statement of Basis document it received via FOIA request, which stated that, because of the level of uncontrolled volatile organic compounds and methanol—*i.e.*, air pollutants—emitted by Danimer Kentucky's facility for producing bioplastics, "the facility will be taking a Federally Enforceable monthly production limit of 500,000 pounds of bioplastic from the Bioplastics Production Area," among other limits. Additionally, the Second Spruce Report cited an Air Inspection Report from the KDEP Division for Air Quality, showing that Danimer's Kentucky facility was of "Out of Compliance" and received a "Notice of Violation." Spruce Point noted that "[w]hile Danimer was out marketing its growth story after the SPAC announcement in October 2020, there was no subsequent disclosure that it was facing compliance violations in Kentucky by the Division of Air Quality."

60.    Following publication of the Second Spruce Report, Danimer's stock price fell to $22.14 per share on April 22, 2021, a 6.3% decrease from the previous trading day's closing price of $23.63.

61.    As a result of Individual Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, the Company has suffered significant losses and damages.

## FIDUCIARY DUTIES

62.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owes and continues to owe Danimer and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care and was/is required to use his/her utmost ability to control and manage Danimer in a fair, just, honest, and equitable manner. The Individual Defendants were/are required to act in furtherance of the best interests of Danimer and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

63.     Each Individual Defendant owes and continues to owe Danimer, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

64.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Danimer, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their executive and/or directorial positions with Danimer, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls so that the market price of the Company's stock would be based on truthful and accurate information.

65.     To discharge their duties, the Individual Defendants were/are required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. The Individual Defendants were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider trading and other deceptive conduct;

(b)     conduct the affairs of the Company in compliance with all applicable laws, rules, and regulations to make it possible to provide the highest quality performance of its business, avoid wasting the Company's assets, and maximize the value of the Company's stock;

(c)     remain informed as to how Danimer conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(d)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Ethics**

66.     The Individual Defendants, as officers and/or directors of Danimer, were bound by the Company's Code of Ethics[2] (the "Code of Ethics") which required the following:

**HONEST, ETHICAL AND FAIR CONDUCT**

Each person owes a duty to the Company to act with integrity. Integrity requires, among other things, being honest, fair and candid. Deceit, dishonesty and subordination of principle are inconsistent with integrity. Service to the Company should never be subordinated to personal gain or advantage.

Each person must:
• Act with integrity, including being honest and candid while still maintaining the confidentiality of the Company's information where required or when in the Company's interests;
• Observe all applicable governmental laws, rules and regulations;
• Comply with the requirements of applicable accounting and auditing standards, as well as Company policies, in order to maintain a high standard of accuracy and completeness in the Company's financial records and other business-related information and data;
• Adhere to a high standard of business ethics and not seek competitive

---

[2] See Danimer Code of Ethics:
https://d1io3yog0oux5.cloudfront.net/_4370daeb39257d3f225eb6f8255fac40/danimerscientific/db/1100/9720/file/Danimer++Scientific+Inc.Code+of+Ethics.pdf

advantage through unlawful or unethical business practices;
• Deal fairly with the Company's customers, suppliers, competitors and employees;
• Refrain from taking advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice;
• Protect the assets of the Company and ensure their proper use;

\*\*\*

## DISCLOSURE

The Company strives to ensure that the contents of and the disclosures in the reports and documents that the Company files with the SEC and other public communications shall be full, fair, accurate, timely and understandable in accordance with applicable disclosure standards, including standards of materiality, where appropriate.

Each person must:
 • not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent registered public accountants, governmental regulators, self-regulating organizations and other governmental officials, as appropriate; and
• in relation to his or her area of responsibility, properly review and critically analyze proposed disclosure for accuracy and completeness.

In addition to the foregoing, **the Chief Executive Officer** and Chief Financial Officer of the Company and each subsidiary of the Company (or persons performing similar functions), **and each other person that typically is involved in the financial reporting of the Company, must familiarize himself or herself with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company.**

\*\*\*

## COMPLIANCE

It is the Company's obligation and policy to comply with all applicable governmental laws, rules and regulations. It is the personal responsibility of each person to, and each person must, adhere to the standards and restrictions imposed by those laws, rules and regulations, including those relating to accounting and auditing matters.

## REPORTING AND ACCOUNTABILITY

The Board is responsible for applying this Code to specific situations in which

questions are presented to it and has the authority to interpret this Code in any particular situation. Any person who becomes aware of any existing or potential breach of this Code is required to notify the Chairperson promptly. Failure to do so is, in and of itself, a breach of this Code.

Specifically, each person must:
• Notify the Chairperson promptly of any existing or potential violation of this Code; and
• Not retaliate against any other person for reports of potential violations that are made in good faith.
The Company will follow the following procedures in investigating and enforcing this Code and in reporting on this Code:
• The Board will take all appropriate action to investigate any breaches reported to it; and
• Upon determination by the Board that a breach has occurred, the Board (by majority decision) will take or authorize such disciplinary or preventive action as it deems appropriate, after consultation with the Company's internal or external legal counsel, up to and including dismissal or, in the event of criminal or other serious violations of law, notification of the SEC or other appropriate law enforcement authorities.
No person following the above procedure shall, as a result of following such procedure, be subject by the Company or any officer or employee thereof to discharge, demotion suspension, threat, harassment or, in any manner, discrimination against such person in terms and conditions of employment.

***

**FINANCIAL STATEMENTS AND OTHER RECORDS**

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must both conform to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation. Records should always be retained or destroyed according to the Company's record retention policies. In accordance with those policies, in the event of litigation or governmental investigation, please consult the Board or the Company's internal or external legal counsel.

(Emphasis added).

**Duties Pursuant to the Company's Audit Charter**

67.     In addition to these duties, the Individual Defendants who served on the Audit

Committee during the Relevant Period, Defendants Basco, Amboian, and Hunt (the "Audit

Committee Defendants"), owed specific duties to Danimer under the Audit Committee Charter

(the "Audit Charter").[3] Specifically the Audit Charter provided for the following responsibilities

of the Audit Committee Defendants to:

> to assist the Board in its oversight of the accounting and financial reporting processes of the Company and the Company's compliance with legal and regulatory requirements. To assist the Board in fulfilling its responsibilities, the Committee shall: (A) oversee: (i) audits of the financial statements of the Company; (ii) the integrity of the Company's financial statements; (iii) the Company's processes relating to risk management and the conduct and systems of internal control over financial reporting and disclosure controls and procedures; (iv) the qualifications, engagement, compensation, independence and performance of the Company's independent auditor, and the auditor's conduct of the annual audit of the Company's financial statements and any other services provided to the Company; and (v) the performance of the Company's internal audit function, if any; and (B) produce the annual report of the Committee required by the rules of the U.S. Securities and Exchange Commission (the "SEC").

***

***Financial Literacy***

> Each member of the Committee shall in the judgment of the Board have the ability to read and understand fundamental financial statements and otherwise meet the financial literacy requirements of NYSE. At least one member shall be an "audit committee financial expert" as such term is defined under applicable SEC rules.

***

## KEY RESPONSIBILITIES

> The Committee relies on the expertise and knowledge of management, the internal auditors, if any, and the independent auditor in carrying out its oversight responsibilities. Management is responsible for the preparation, presentation, and integrity of the Company's financial statements, for the appropriateness of the accounting principles and reporting policies that are used by the Company, and for establishing and maintaining effective internal control over financial reporting. The independent auditor is responsible for auditing the Company's financial statements and, if applicable, the Company's internal control over financial reporting, and for reviewing the Company's unaudited interim financial statements.

---

[3] See Danimer Audit Committee Charter at:
https://d1io3yog0oux5.cloudfront.net/_0adb42b0347b670c2378307e4a1add40/danimerscientific/db/1100/9714/file/Audit_Committee+Charter+Danimer.pdf

23

The responsibilities set forth in this charter do not reflect or create any duty or obligation of the Committee to plan or conduct any audit; to determine or certify that the Company's financial statements are complete, accurate, fairly presented or in accordance with generally accepted accounting principles ("GAAP") or applicable law; to guarantee or otherwise certify as to the independent auditor's reports; to conduct investigations; or to assure compliance with laws and regulations or the Company's code of business conduct and ethics, internal policies, procedures and controls. The following responsibilities are set forth as a guide for fulfilling the Committee's purposes in such manner as the Committee determines is appropriate.

***

### B. Financial Statements and Other Financial Disclosures

(i) *Quality and Integrity of Financial Statements*. The Committee shall review and discuss with management and the independent auditor: the critical accounting policies and practices used by the Company, and any significant changes in the selection or application of the Company's accounting and auditing principles and practices as suggested by the Company's independent auditor, internal auditors, if any, or management; the accounting treatment to be applied in respect of significant new transactions or other significant events not in the ordinary course of the Company's business; other policies and procedures adopted by the Company to fulfill its responsibilities regarding the presentation of financial statements in accordance with GAAP and applicable rules and regulations of the SEC, including the proper explanation and reconciliation of any non-GAAP measures presented; and any issues that arise with respect to the quality or integrity of the Company's financial statements.

(ii) *Audited Financial Statements*. The Committee shall review and discuss with management and the independent auditor, before the issuance of the audit report, the financial statements and related notes and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" proposed to be included in the Company's Annual Report on Form 10-K. In this connection, the Committee shall review and discuss with management and the independent auditor the analyses prepared by management setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements (including analyses of the effects of alternative GAAP methods on the financial statements), and such other matters for which discussion shall be required by applicable auditing and related PCAOB standards. The Committee shall make a recommendation to the Board as to whether such financial statements should be included in the Company's Annual Report on Form 10-K.

(iii) *Audit Committee Report*. The Committee shall annually prepare an audit committee report for inclusion where necessary in the proxy statement relating to the annual meeting of stockholders and/or annual report of the Company.

(iv) ***Quarterly Financial Statements***. The Committee shall review and discuss with management and the independent auditor the quarterly financial statements and related notes and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" proposed to be included in the Company's Quarterly Reports on Form 10-Q, together with the analyses prepared by management setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, and such other matters for which discussion shall be required by applicable auditing standards and related PCAOB standards.

(v) ***Earnings Releases and Other Financial Information***. The Committee shall discuss with management and the independent auditor and, prior to issuance, review and approve the Company's earnings releases, including the financial information, use of any "pro forma" or "adjusted" non-GAAP information, and earnings guidance (if such is provided) to be disclosed in such releases. The Committee shall also discuss with management other significant financial information to be provided to analysts or rating agencies.

***

### C. Controls and Procedures

(i) ***Oversight***. The Committee shall provide oversight of management's design and maintenance of the Company's internal control over financial reporting and disclosure controls and procedures. Prior to the filing of the Company's Annual Report on Form 10-K, the Committee shall review with the independent auditor, management and the head of the internal audit function, if any: the Company's annual assessment and report and the independent auditor's report on the effectiveness of the Company's internal control over financial reporting, to the extent then applicable; any "material weakness" or "significant deficiency" in the design or operation of internal control over financial reporting, any steps taken to resolve any such control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting; and any related significant findings and recommendations of the independent auditor or internal audit function, if any, together with management's responses (including, in the case of the independent auditor, any concerns regarding matters within the scope of, and compliance with, Section 10A of the Exchange Act).

***

### D. Risk Management, Compliance and Ethics

(i) ***Risk Management***. The Committee shall review and discuss with management, the head of the internal audit function, if any, and the independent auditor any significant risks or exposures and the Company's policies and processes with respect to risk assessment and risk management, and shall assess the steps management has taken to monitor and control such risks, except with respect to those risks for which

oversight has been assigned to other committees of the Board or retained by the Board. The Committee shall review the Company's annual disclosures concerning the role of the Board in the risk oversight of the Company.

(ii) *Legal and Regulatory Compliance*. The Committee shall review and assess with the Chairman, Co-Chairman or Co-Executive Chairman of the Board or outside counsel, as appropriate, legal and regulatory matters that may have a material impact on the Company's financial statements or accounting policies. The Committee shall also review and recommend for Board approval the code of business conduct and ethics and any other appropriate compliance policies, and will review requests for waivers under the code of business conduct and ethics sought with respect to any executive officer or director. The Committee shall review annually with the Chairman, Co Chairmen or Co-Executive Chairman of the Board or outside counsel, as appropriate, the scope, implementation and effectiveness of the ethics and compliance program, and any significant deviations by officers and employees from the code of business conduct and ethics or other compliance policies, and other matters pertaining to the integrity of management.

(iii) *Procedures for Complaints*. The Committee shall establish "whistleblowing" procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and (b) the confidential, anonymous submission by the Company's employees of concerns regarding questionable accounting or auditing matters. The Committee shall review any such significant complaints or concerns.

**Duties Pursuant to the Company's Nominating and Corporate Governance Committee Charter and Corporate Governance Guidelines**

68.     The Individual Defendants who served on the Nominating and Corporate Governance Committee during the Relevant Period, Defendants Noda, Pratt and Amboian (the "Nominating Committee Defendants"), owed specific duties to Danimer under the Nominating and Corporate Governance Committee Charter (the "Nominating Charter"). [4]  Specifically, the Nominating Charter provided for the following responsibilities of the Nominating Committee Defendants:

Develop, review and assess the adequacy of the Company's corporate governance principles and guidelines annually, recommend to the Board any changes the Committee deems appropriate and oversee implementation of such guidelines.

---

[4] See Danimer Nominating Charter:
Nominating Committee Charter (00770491-2).DOCX (d1io3yog0oux5.cloudfront.net)

***

Review and discuss as appropriate with management the Company's disclosures relating to director independence, governance and director nomination matters and, based on such review and discussion, determine whether to recommend to the Board that such disclosures be disclosed in the Company's Annual Report on Form 10-K or annual proxy statement filed with the SEC, as applicable.

Review on a regular basis the Company's overall corporate governance and recommend improvements as and when necessary.

69.     In addition, each of the Defendants, Croskrey, Basco, Calhoun, Hunt, Noda, Pratt, Amboian, and Hendrix ("the Director Defendants") owe specific duties to Danimer under the Danimer Corporate Governance Guidelines.[5]   Specifically, the Danimer Corporate Governance Guidelines stated, in relevant part:

Except as permitted by the Charter, Directors are prohibited from:
(a) taking for themselves personally opportunities related to the Company's business if such opportunities were specifically presented to such director for the Company's benefit in his or her capacity as a director of the Company; (b) using the Company's property, information, or position for personal gain; or (c) competing with the Company for business opportunities if such opportunities were specifically presented to such director for the Company's benefit in his or her capacity as a director of the Company. However, if the Company's disinterested directors determine that the Company will not pursue an opportunity that relates to the Company's business, and consent to a director then personally pursuing the opportunity, then a director may do so.

## BREACHES OF DUTIES

70.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and/or directors of Danimer, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

71.     The Individual Defendants breached their duties of loyalty and good faith by utterly

---

[5] See Danimer Corporate Governance Guidelines:
https://d1io3yog0oux5.cloudfront.net/_7f245ae5ec3762b0ccf413908b7565c3/danimerscientific/db/1100/9719/file/Danimer+Scientific+Inc+Corporate+Governance+Guidelines.pdf

failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls, especially with respect to disclosure of material information regarding the extensive problems the Company was encountering, in connection with overstating the biodegradability of Nodax, the Company's emissions of hazardous air pollutants, the Company's exposure to regulatory risks, and the size of Danimer's operations. The Individual Defendants also breached their duties of loyalty and good faith by allowing the Company to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets and caused Danimer substantial damage.

72.     The Audit Committee Defendants and the Nominating Committee Defendants had a duty to review the Company's earnings press releases and regulatory filings. The members of the Audit Committee breached their duties of loyalty and good faith by approving the omission of material information, making the improper statements detailed herein, and failing to properly oversee Danimer's public statements and internal control function.

73.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Danimer, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of Individual Defendants' improper course of conduct, the Company is now the subject of the Federal Securities Class Action, which alleges violations of federal securities laws. As a result, Danimer has expended, and will continue to expend, significant sums of money.

## DAMAGES TO DANIMER

74.     The deficient internal controls which lead to the issuance of materially false and misleading statements regarding the Company's emissions of hazardous air pollutants, the Company's operations' size and regulatory compliance, and Nodax's biodegradability, have

exposed the Company to reputational and financial damages, including but not limited to:

      (a)      Restatements and goodwill impairments;

      (b)      Liability arising from the Federal Securities Class Action;

      (c)      Potential increased director and officer insurance premiums;

      (d)      The loss of credibility with customers, investors, and suppliers; and

      (e)      Legal and accounting costs associated with litigation, investigations, and restatements.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

75.    Plaintiff brings this action derivatively and for the benefit of Danimer to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Danimer, waste of corporate assets, unjust enrichment, and violations of 20(a) of the Exchange Act.

76.    Danimer is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

77.    Plaintiff is, and has been, a stockholder of Danimer during the wrongdoing complained of herein. Plaintiff will adequately and fairly represent the interests of Danimer in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

78.    Plaintiff incorporates by reference and re-alleges each allegation stated above as if fully set forth herein.

79.    A pre-suit demand on the Board of Danimer is futile and, therefore, excused. At the time of filing of this action, the Board consists of Defendants Croskrey, Basco, Calhoun, Hunt, Noda, Pratt, Amboian, and Hendrix (the "Director Defendants"). Plaintiff needs only to allege demand futility as to half (four) of the Director Defendants who are on the Board at the time this

action is commenced.

80.     Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

81.     In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

82.     Demand on Defendant Croskrey is futile because Defendant Croskrey cannot disinterestedly and independently consider a demand. As acknowledged in Danimer's public filings, Croskrey is not an independent director. He served as Danimer's Predecessor's CEO and a director and serves in the same capacity at Danimer. Further, as of March 26, 2021, Croskrey held over 5% of the Company's outstanding common stock, and any stock decline will affect him financially. Additionally, Defendant Croskrey, upon closing of the Amalgamation, was given an option to purchase 1,154,616 shares of Common Stock under Danimer's new equity incentive plan where options would not be exercisable until certain events occur in the future. Therefore, Croskrey had a motive to conceal negative news concerning the Company's core products. Defendant Croskrey signed and thus personally made the false and misleading statements in the

2020 10-K, outlined herein. Thus, Defendant Croskrey cannot impartially consider a demand, because Defendant Croskrey received a material personal benefit and faces a substantial likelihood of liability. Further, Defendant Croskrey lacks independence from the directors he served with on Danimer's Predecessor's board of directors, including Calhoun, Hunt, Noda, and Pratt. Calhoun, Hunt, Noda, and Pratt each received a material personal benefit as a result of the stock price being artificially inflated and face a substantial likelihood of liability.

83.     Demand on Defendant Basco is futile because Defendant Basco cannot disinterestedly and independently consider a demand. She is a member of the Audit Committee and is responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls, as outlined herein. Further, she is a former member of Danimer's Predecessor's board of directors and thus has an entwined relationship with Defendants Croskrey and Amboian. Defendant Basco signed and thus personally made the false and misleading statements in the 2020 10-K, outlined herein. Thus, Defendant Basco cannot impartially consider a demand, because Defendant Basco faces a substantial likelihood of liability. Further, Defendant Basco lacks independence from the directors she served with on Danimer's Predecessor's board of directors, including Croskrey, Calhoun, Hunt, Noda, and Pratt. Croskrey, Calhoun, Hunt, Noda, and Pratt each received a material personal benefit as a result of the stock price being artificially inflated and face a substantial likelihood of liability.

84.     Demand on Defendant Calhoun is futile because Defendant Calhoun cannot disinterestedly and independently consider a demand. Calhoun is a former director of Danimer's Predecessor and has also been a director for two of its subsidiaries. Additionally, Defendant Calhoun, upon closing of the Amalgamation, received 72,714 shares of the Company's Class A

common stock. Therefore, Calhoun had a motive to conceal negative news concerning the Company's core products. Defendant Calhoun signed and thus personally made the false and misleading statements in the 2020 10-K, outlined herein. Thus, Defendant Calhoun cannot impartially consider a demand, because Defendant Calhoun received a material personal benefit and faces a substantial likelihood of liability. Further, Defendant Calhoun lacks independence from the directors he served with on Danimer's Predecessor's board of directors, including Croskrey, Hunt, Noda, and Pratt. Croskrey, Hunt, Noda, and Pratt each received a material personal benefit as a result of the stock price being artificially inflated and face a substantial likelihood of liability.

85.     Demand on Defendant Hunt is futile because Defendant Hunt cannot disinterestedly and independently consider a demand. Hunt was a member of Danimer's Predecessor's board, and is also a senior executive of Apollo, whose subsidiaries sold their entire position pursuant to the February Prospectus. Further, Hunt is a member of the Audit Committee, and is responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls, as outlined herein. Defendant Hunt signed and thus personally made the false and misleading statements in the 2020 10-K, outlined herein. Thus, Defendant Hunt cannot impartially consider a demand, because Defendant Hunt received a material personal benefit and faces a substantial likelihood of liability. Further, Defendant Hunt lacks independence from the directors he served with on Danimer's Predecessor's board of directors, including Croskrey, Calhoun, Noda, and Pratt. Croskrey, Calhoun, Noda, and Pratt each received a material personal benefit as a result of the stock price being artificially inflated and face a substantial likelihood of liability.

86.     Demand on Defendant Noda is futile because Defendant Noda cannot

32

disinterestedly and independently consider a demand. Noda was a director on Danimer's Predecessor's board of directors. Noda is also a member of the Nominating and Corporate Governance Committee and is responsible for ensuring there are policies and procedures in place and investigations are commenced with respect to the activities complained of herein. Additionally, Defendant Noda, upon closing of the Amalgamation, received shares of the Company's Class A common stock. As of March 30, 2021 he held 446,915 shares of the Company's stock.  Therefore, Defendant Noda had a motive to conceal negative news concerning the Company's core products. Defendant Noda signed and thus personally made the false and misleading statements in the 2020 10-K, outlined herein. Thus, Defendant Noda cannot impartially consider a demand because Defendant Noda received a material personal benefit and faces a substantial likelihood of liability. Further, Defendant Noda lacks independence from the directors he served with on Danimer's Predecessor's board of directors, including Croskrey, Calhoun, Hunt, and Pratt. Croskrey, Calhoun, Hunt, and Pratt each received a material personal benefit as a result of the stock price being artificially inflated and face a substantial likelihood of liability.

87.     Demand on Defendant Pratt is futile because Defendant Pratt cannot disinterestedly and independently consider a demand. As acknowledged in Danimer's public filings, Pratt is not an independent director. Further, he was Danimer's Predecessor's chairman, and therefore has a business relationship with Croskrey. As he serves on the Nominating and Corporate Governance Committee, he was responsible for ensuring there are policies and procedures in place and investigations are commenced with respect to the activities complained of herein. Additionally, Pratt, upon closing of the Amalgamation, was given an option to purchase 312,258 shares of Common Stock under Danimer's new equity incentive plan where options would not be exercisable until certain events occur in the future. Therefore, Pratt had a motive to conceal

negative news concerning the Company's core products. Defendant Pratt signed and thus personally made the false and misleading statements in the 2020 10-K, outlined herein. Thus, Defendant Pratt cannot impartially consider a demand, because Defendant Pratt received a material personal benefit and faces a substantial likelihood of liability. Further, Defendant Pratt lacks independence from the directors he served with on Danimer's Predecessor's board of directors, including Croskrey, Calhoun, Hunt, and Noda. Croskrey, Calhoun, Hunt, and Noda each received a material personal benefit as a result of the stock price being artificially inflated and face a substantial likelihood of liability.

88.     Demand on Defendant Amboian is futile because Defendant Amboian cannot disinterestedly and independently consider a demand. Defendant Amboian was previously Live Oak's chairman, and therefore has a personal relationship with Croskrey. As a member of both the Audit Committee and the Nominating and Corporate Governance Committee, he was responsible for ensuring that corporate governance measures and appropriate policies and procedures were in place to avoid the wrongdoing alleged herein. Further, Amboian is a beneficiary of the Live Oak Sponsor Partners, which holds a large number of shares in the Company. Additionally, Amboian also holds a direct or indirect interest in Live Oak Sponsor Partners. Simultaneously, with the closing of the Initial Public Offering, the Company consummated the sale of 6,000,000 warrants (the "Private Placement Warrants") at a price of $1.00 per private placement warrant in a private placement to Live Oak Sponsor Partners, generating gross proceeds of $6,000,000. Amboian has a personal interest in the value of the Private Placement Warrants. Further, Defendant Amboian signed and thus personally made the false and misleading statements in the 2020 10-K, outlined herein. Thus, Defendant Amboian cannot impartially consider a demand, because Defendant Amboian received a material personal benefit and faces a substantial likelihood of liability.

89.     Demand on Defendant Hendrix is futile because Defendant Hendrix cannot disinterestedly and independently consider a demand. Hendrix was previously Live Oak's chairman. In addition, Hendrix has shared voting control over Live Oak Valfund Plastics Fund, LLC and is a managing member of Live Oak Sponsor Partners.  Thus, he has voting and investment discretion with respect to the common stock held of record by Live Oak Sponsor Partners and Live Oak Valfund Plastics Fund, LLC. Defendant Hendrix signed and thus personally made the false and misleading statements in the 2020 10-K, outlined herein. Thus, Defendant Hendrix cannot impartially consider a demand, because Defendant Hendrix faces a substantial likelihood of liability.

90.     As trusted Company directors, the above Director Defendants conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded their duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded their duties to protect corporate assets. For the above reasons, these Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

91.     Pursuant to the Company's Audit Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls. The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Charter, and allowed the Company to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary

duties, are not disinterested, and demand is excused as to them.

92.     In violation of the Code of Ethics, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and unjust enrichment. In further violation of the Code of Ethics, the Director Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, protect and properly use corporate assets, and properly report violations of the Code of Ethics. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

93.     Pursuant to the Company's Nominating Charter and the Corporate Governance Guidelines, the Nominating Committee Defendants, and the Director Defendants respectively, are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's reporting practices and system of internal controls. The Nominating Committee Defendants and the Director Defendants, allowed the Company to issue false and misleading financial statements with the SEC, in violation of the relevant Charter and Guidelines Thus, the Nominating Committee Defendants and the Director Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

94.     Danimer has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for

Danimer any part of the damages Danimer suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

95.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's various Charters (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the issues challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

96.    The acts complained of herein constitute violations of fiduciary duties owed by Danimer's officers and directors, and these acts are incapable of ratification.

**<u>Insurance Considerations</u>**

97.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Danimer. If there is a directors' and officers' liability insurance policy covering the Relevant Period, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Danimer, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a

recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

98.     If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Danimer to sue any other wrongdoers, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

99.     Thus, for all the reasons set forth above, all of the Director Defendants, and, if not all of them, at least a majority of Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants
*for Violations of Section 20(a) of the Exchange Act*

100.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

101.     The Individual Defendants, by virtue of their positions with Danimer and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Danimer and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence, and the exercised same, to cause Danimer to engage in the illegal conduct and practices complained of herein.

102.     Plaintiff, on behalf of Danimer, has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants
*for Breach of Fiduciary Duties*

103.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

104.     Each Individual Defendant owed to the Company the duty to exercise candor, good

faith, and loyalty in the management and administration of Danimer's business and affairs.

105.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

106.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Danimer.

107.    In breach of their fiduciary duties, the Individual Defendants caused the Company to engage in the misconduct described herein.

108.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure, controls, and procedures.

109.    Also, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements during the Relevant Period regarding, inter alia, the Company's operations' size and regulatory compliance, and overstating Nodax's biodegradability, particularly in oceans and landfills.

110.    The Individual Defendants failed to correct and/or caused the Company to fail to rectify any of the wrongs described herein or correct the false and/or misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

111.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that

they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

112.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

113.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

114.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Danimer has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

115.    Plaintiff, on behalf of Danimer, has no adequate remedy at law.

### THIRD CLAIM

**Against Individual Defendants**
*for Unjust Enrichment*

116.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

117.    By their wrongful acts, violations of law, false and misleading statements, and omissions of material fact that they made and/or caused to be made, the Individual Defendants

were unjustly enriched at the expense of and to the detriment of Danimer.

118.    The Individual Defendants either benefitted financially from the improper conduct, received unjust compensation tied to the false and misleading statements, received bonuses, stock options, or similar compensation from Danimer tied to the performance or artificially inflated valuation of Danimer, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

119.    Plaintiff, as a stockholder and a representative of Danimer, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits— including benefits, performance-based, valuation-based, and other compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

120.    Plaintiff, on behalf of Danimer, has no adequate remedy at law.

## **FOURTH CLAIM**

### **Against Individual Defendants**
*for Waste of Corporate Assets*

121.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

122.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions and engage in internal investigations, and Danimer will lose financing from investors and business from future customers who no longer trust the Company and its products.

123.    Because of the waste of corporate assets, the Individual Defendants are each liable to the Company.

124.    Plaintiff, on behalf of Danimer, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

125.    **FOR THESE REASONS**, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of Danimer, and that Plaintiff is an adequate representative of the Company;

B.      Declaring that the Individual Defendants have breached their fiduciary duties to Danimer;

C.      Determining and awarding to Danimer the damages sustained by it because of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre- and post-judgment interest thereon;

D.      Directing Danimer and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and protect Danimer and its stockholders from a repeat of the damaging events described herein;

E.      Awarding Danimer restitution from Individual Defendants;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G.      Granting such other and further relief as the Court may deem just and proper.

Dated: October 6, 2021                          **BIELLI & KLAUDER, LLC**

                                                _/s/ Ryan M. Ernst_____
                                                Ryan M. Ernst (No. 4788)
                                                1204 N. King Street
                                                Wilmington, DE 19801
                                                (302) 803-4600
                                                rernst@bk-legal.com

**LEVI & KORSINSKY, LLP**
Gregory M. Nespole
Ryan C. Messina
55 Broadway, 10th Floor
New York, NY 10006
T. 212.363.7500
F. 212.363.7171
gnespole@zlk.com
rmessina@zlk.com

*Attorneys for Plaintiff Ryan Perri*